**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**PALM BEACH DIVISION**

CASE NO.: 9:18-cv-80377-DMM

EVANSTON INSURANCE COMPANY,

                 Plaintiff,

vs.

PATRICK WHYTE CONSTRUCTION, INC., a
Florida corporation, ALBERT RABIL and
TAMARA RABIL, and SEASIDE BUILDERS,
LLC, a Florida limited liability company,

                 Defendants.

_____/

## AMENDED COMPLAINT FOR DECLARATORY JUDGMENT

     Plaintiff, Evanston Insurance Company on behalf of itself and, as successor by merger to

Essex Insurance Company (hereinafter "EVANSTON"), by and through its undersigned counsel

and pursuant to this Court's Endorsed Order (D.E.4) and Fed. R. Civ. P. 15(a)(a), hereby files

this Amended Complaint for Declaratory Judgment against the Defendants, Patrick Whyte

Construction, Inc. ("PWC"), Albert Rabil ("A. Rabil") and Tamara Rabil ("T. Rabil")

(collectively, the "Rabils"), and Seaside Builders, LLC ("Seaside") (collectively "Defendants")

and states as follows:

## PRELIMINARY STATEMENT

     1.     This is a declaratory judgment action to determine an actual controversy between

the parties with respect to a series of commercial general liability insurance policies issued by

Essex Insurance Company ("Essex") to PWC and a series of excess liability insurance policies

issued by EVANSTON to PWC.  As of July 1, 2016, Plaintiff, EVANSTON, is the successor by merger to Essex.

2.       EVANSTON seeks a judgment declaring that it has no duty to defend or indemnify PWC with respect to the claims by the Rabils asserted against PWC relating to alleged construction defects in the Rabils' residence located at 344 North Ocean Drive, Delray Beach, Florida (the "Home").

## JURISDICTION AND PARTIES

3.       This is an action for declaratory relief pursuant to Rule 57 of the Federal Rules of Civil Procedure, 28 U.S.C. § 2201, and Chapter 86 of the Florida Statutes.

4.       Jurisdiction is proper pursuant to 28 U.S.C. §§ 1332 and 1367 because there is complete diversity and the amount in controversy exceeds the sum of $75,000.00, exclusive of all interest and costs.

5.       Venue is proper in this Court pursuant to 28 U.S.C. § 1391 because one or more of the defendants is a resident of this district, and because the defendants are subject to personal jurisdiction within the district.

6.       Plaintiff, EVANSTON, is an Illinois corporation, is a foreign insurer authorized to do business in Florida with its principal place of business in Deerfield, Illinois, and is a citizen of Illinois.

7.       Defendant PWC is a Florida corporation with its principal place of business in Delray Beach, Florida, and is a citizen of Florida.

8.       Defendant A. Rabil is an individual residing in Delray Beach, Florida, and is a citizen of Florida.

2

9.      Defendant T. Rabil is an individual residing in Delray Beach, Florida, and is a citizen of Florida.

10.     Defendant Seaside is a Florida limited liability company that is comprised of members PWC, who, as alleged in paragraph 7 above is a citizen of Florida, and Driscoll Partners, LLC ("Driscoll"), a Florida limited liability company, with its principal place of business in Vero Beach, Florida.  Driscoll is a comprised of members William Driscoll Jr. and Mary Driscoll, who are citizens of Florida.    Seaside, having its principal place of business in Florida and being comprised of members that are all citizens of Florida, is a citizen of Florida.

## UNDERLYING LAWSUIT

11.     EVANSTON brings this action to obtain a declaratory judgment finding that it has no duty to defend or indemnify PWC in connection with a lawsuit filed by Albert and Tamara Rabil against PWC in the Circuit Court of the Fifteenth Judicial Circuit in and for Palm Beach County, Florida, styled *Albert Rabil and Tamara Rabil v. Seaside Builders, LLC, Thomas Laudani, and Patrick Whyte Construction, Inc.*, with case number 2016-CA-003916 (the "Underlying Complaint" or the "Underlying Lawsuit").  A copy of the operative Underlying Complaint is attached as Exhibit A.

12.     On April 8, 2016, the Rabils filed the Underlying Lawsuit concerning the construction of their Home.  On or about November 3, 2016 Plaintiffs filed an Amended Complaint adding PWC to the Lawsuit alleging that PWC "provided contracting services for Seaside's construction … [as the] shell subcontractor for the Home provided laborers for work at the Home."  See Exhibit A, ¶5.

13.     On January 11, 2018, the Rabils filed the Fourth Amended Complaint in the Underlying Lawsuit which, upon information and belief, is the operative complaint in the Underlying Lawsuit.  <u>See</u> Exhibit A.

14.     On December 18, 2013, the Rabils entered into a Construction Agreement with Seaside for the Construction of their Home.  <u>Id</u>., ¶9.  The contract price was $5,287,949.00. According to the Agreement, construction was to commence no later than 15 days after issuance of the building permit, and Seaside agreed to make its best efforts to substantially complete the work within 18 months of the commencement date.  The Underlying Lawsuit alleges delay against Seaside, among other things.  <u>Id</u>., ¶13.

15.     The Certificate of Occupancy/Certificate of Completion for the Home was issued on March 30, 2016.

16.     In Count I, the Rabils sue Seaside for Breach of Contract alleging that, among other things, Seaside:

- failed to properly accomplish the Work required of it under the Contract;
- failing to make payment to subcontractors…resulting in liens… ;
- failing to meet the Completion Date in the Contract;
- failing to complete the Work;
- performing defective and incomplete work which defective and incomplete work by one subcontractor has damaged the work performed by other subcontractors;
- billing for repairs to defective original Work;
- billing for modifications to the Work necessitated by Seaside's failure to properly sequence the Work;
- submitting fraudulent payment applications;
- misappropriating construction funds;
- failing to properly supervise, schedule, and sequence subcontractors, thereby resulting in overcharges to Plaintiffs and damage to one subcontractor's work by other subcontractor; and
- abandoning the Work.

<u>See</u> Exhibit A, ¶13 and subparts.

17.     The Rabils sue Thomas Laudani in Count II for Fraud in conjunction with signing and submitting applications for payment on behalf of Seaside.

18.     In Count III, the Rabils sue PWC for Violations of the Building Code including but not limited to the following:

- Violation of Section 104.9 – failure to install materials, equipment and devices approved by the building official in accordance with such approval;
- Violation of Section 1901.1 and 1901.2 -- failure to properly construct structural concrete slabs, hollowcore slabs and exterior concrete balconies in accordance with the building code and AISC 318 as amended in section 1908 of the code;
- Violation of Section 2203.3 – failure to paint the structural steel members in accordance with the requirements contained in AISC 360;
- Violation of Section 2204.2.1 – failure to install the anchor rods accurately to the pattern and dimensions call [sic] for on the plans; and
- Violation of Section 2205.1 – failure to design, fabricate and erect structural steel in accordance with AISC 360.

See Exhibit A, ¶28 and subparts.

19.     The Rabils allege that PWC violated the applicable building codes by failing to properly perform its work including but not limited to the faulty installation of various materials, faulty construction, and faulty design, fabrication and erection of materials in conjunction with constructing the Home.  See Exhibit A, ¶28 and subparts.

20.     The alleged building code violations "have resulted in damage to the work performed by other subcontractors, PWC's own work and to the property of Plaintiff."  Id., ¶29.

21.     As a result of these alleged violations, the Underlying Lawsuit alleges that "Plaintiffs have suffered both direct and special damages including, without limitation, consequential loss of use of the Home, diminution in value, expert testing and consulting expenses, property damage, repair costs, replacement material and supply expenses, security expenses, moving and storage expenses, interest and insurance expenses, permit and inspection expenses, and other consequential damages."  Id., ¶31.  In addition, the Rabils seek general and

special damages, interest, costs and any additional relief that the Court deems just and proper under the circumstances.

22.     PWC sought defense and indemnity from EVANSTON for the Underlying Lawsuit.

23.     On January 17, 2017, EVANSTON accepted the defense of PWC in the Underlying Lawsuit under a reservation of rights.  See Reservation of Rights dated January 17, 2017, Exhibit B.

24.     Among other things, the Reservation of Rights dated January 17, 2017, requested copies of all certificates of insurance and/or additional insured endorsements provided by any subcontractors.  See Exhibit B.  PWC failed to comply with this request.

25.     On or about August 25, 2017, PWC's counsel reported that PWC did not self-perform any work on the Home.

26.     On April 26, 2017, PWC filed an Amended Third-Party Complaint in the Lawsuit against its seven subcontractors and alleging that there were no written subcontracts between PWC and any of its subcontractors.  See Amended Third-Party Complaint, Exhibit C.

27.     PWC failed to require, secure and maintain certificates of insurance confirming that the subcontractors named PWC as an additional insured on their commercial general liability policies and that those policies limits were at least $1 million each occurrence/$2 million general aggregate/$2 million products-completed operations aggregate.

28.     On October 25, 2017, EVANSTON issued its Supplemental Reservation of Rights and Partial Coverage Disclaimer, identifying additional coverage defenses under the Evanston Policies and advising PWC that its failure to comply with the subcontractor conditions of the Evanston Policies resulted in the reduction of the limits under each Evanston Policy and the

erosion of those limits due to payment of defense costs.  See Supplemental Reservation of Rights and Partial Coverage Disclaimer dated October 25, 2017, Exhibit D.

29.    Among other things, the Supplemental Reservation of Rights and Partial Coverage Disclaimer dated October 25, 2017, requested any information or documentation that the PWC believes that Evanston should consider.  See Exhibit D.  PWC did not respond to this request.

30.    EVANSTON's October 25, 2017 Supplemental Reservation of Rights and Partial Coverage Disclaimer also addressed the availability of coverage under the Evanston Excess Policies.  See Exhibit D.

31.    As of October 25, 2017, EVANSTON had incurred legal expenses totaling $152,006.71.  See Exhibit D.

32.    On March 12, 2018, EVANSTON advised PWC that EVANSTON had incurred $191,453.01 in legal expenses and the maximum amount remaining to defend, and potentially indemnify, PWC under the Evanston Policies totaled $308,546.99.  See March 12, 2018 E-mail from Ted Matthews to Patrick Whyte, attached as Exhibit E.

### THE EVANSTON POLICIES

**A.    The First and Second Primary Policies**

33.    Essex issued new commercial general liability policy number 3DN0500 to PWC which was in effect from June 14, 2013 to June 14, 2014 (the "First Primary Policy").  See First Primary Policy attached hereto as Exhibit F.  Essex renewal policy 3DT5848 was in effect between June 14, 2014 and June 14, 2015 (the "Second Primary Policy").  See Second Primary Policy attached hereto as Exhibit G.  Each policy has limits of $1,000,000 each occurrence/$2,000,000 general aggregate limit (other than products/completed operations)/and

$2,000,000 products/completed operations aggregate limit.

**B.    The Third and Fourth Primary Policies**

34.    Essex issued new commercial general liability policy 2CN5552 to PWC which was in effect from June 14, 2015 to June 14, 2016 (the "Third Primary Policy").  <u>See</u> Third Primary Policy attached hereto as Exhibit H.  Renewal policy 3ED0364 was in effect between June 14, 2016 and July 2, 2017 ("the "Fourth Primary Policy").  <u>See</u> Fourth Primary Policy attached hereto as Exhibit I.  Each policy has limits of $1,000,000 each occurrence/$2,000,000 general aggregate limit (other than products/completed operations)/and $1,000,000 products/completed operations aggregate limit.

**C.    Primary Policy Language**

35.    Each Primary Policy contains the following insuring language, in relevant part:

**SECTION I – COVERAGES**

**COVERAGE A BODILY INJURY AND PROPERTY DAMAGE LIABILITY**

**1.    Insuring Agreement**

    **a.**    We will pay those sums that the insured becomes legally obligated to pay as damages because of "bodily injury" or "property damage" to which this insurance applies. We will have the right and duty to defend the insured against any "suit" seeking those damages. However, we will have no duty to defend the insured against any "suit" seeking damages for "bodily injury" or "property damage" to which this insurance does not apply. We may, at our discretion, investigate any "occurrence" and settle any claim or "suit" that may result.  But:

        ***

    **b.**    This insurance applies to "bodily injury" and "property damage" only if:

        ***

        **(2)**    The "bodily injury" or "property damage" occurs during the policy period; and

        **(3)**    Prior to the policy period, no insured listed under Paragraph

**1.** of section **II** – Who Is An Insured and no "employee" authorized by you to give notice of an "occurrence" or claim, knew that the "bodily injury" or "property damage" had occurred, in whole or in part. If such a listed insured or authorized "employee" knew, prior to the policy period, that the "bodily injury" or "property damage" occurred, then any continuation, change or resumption of such "bodily injury" or "property damage" during or after the policy period will be deemed to have been known prior to the policy period.

\*\*\*

**d.** "Bodily injury" or "property damage" will be deemed to have been known to have occurred at the earliest time when any insured listed under Paragraph 1. of Section II – Who Is an Insured or any "employee" authorized by you to give or receive notice of an "occurrence" or claim:

    **(1)** Reports or, or any part, of the "bodily injury" or "property damage" to us or any other insurer;

    **(2)** Receives a written or verbal demand or claim for damages because of the "bodily injury" or "property damage"; or

    **(3)** Becomes aware by any other means that "bodily injury" or "property damage" has occurred or begun to occur.

\*\*\*

<u>See</u> Exhibits F, G, H and I.

36. Each Primary Policy contains the following relevant provisions:

**SECTION V – DEFINITIONS**

\*\*\*

a. "Occurrence" means an accident, including continuous or repeated exposure to substantially the same general harmful conditions.

\*\*\*

37. "Products-completed operations hazard":

    **a.** Includes all "bodily injury" and "property damage" occurring away from premises you own or rent and arising out of "your product" or "your work" except:

        **(1)** Products that are still in your physical possession; or

    **(2)**    Work that has not yet been completed or abandoned. However, "your work" will be deemed completed at the earliest of the following times:

        **(a)**    When all of the work called for in your contract has been completed.

        **(b)**    When all of the work to be done at the job site has been completed if your contract calls for work at more than one job site.

        **(c)**    When that part of the work done at a job site has been put to its intended use by any person or organization other than another contractor or subcontractor working on the same project.

    Work that may need service, maintenance, correction, repair or replacement, but which is otherwise complete, will be treated as completed.

    \*\*\*

38.    "Property damage" means:

    **a.**    Physical injury to tangible property, including all resulting loss of use of that property. All such loss of use shall be deemed to occur at the time of the physical injury that caused it; or

    **b.**    Loss of use of tangible property that is not physically injured. All such loss of use shall be deemed to occur at the time of the "occurrence" that caused it.

    \*\*\*

\*\*\*

39.    "Your work":

    **a.**    Means:

        **(1)**    Work or operations performed by you or on your behalf; and

        **(2)**    Materials, parts or equipment furnished in connection with such work or operations.

    **b.**    Includes:

        **(1)**    Warranties or representations made at any time with respect to the fitness, quality, durability, performance or use of "your work", and

        **(2)**    The providing of or failure to provide warnings or instructions.

<u>See</u> Exhibits F, G, H and I.

**D.    Excess Policies**

40.    Evanston Insurance Company issued new Excess Liability Policy XOVA891215 to PWC which was in effect between February 5, 2015 and June 14, 2015 with limits of $1,000,000 each occurrence/$1,000,000 aggregate ("First Excess Policy").  The First Excess Policy identifies the Second Primary Policy as the Controlling Underlying Insurance Policy.  <u>See</u> First Excess Policy attached hereto as Exhibit J.

41.    Evanston Insurance Company issued new Commercial Excess Liability Policy MKLV20LE101993 to PWC which was in effect between June 14, 2015 and June 14, 2016 with limits of $1,000,000 each occurrence/$1,000,000 aggregate ("Second Excess Policy").  The Second Excess Policy identifies the Third Primary Policy as "Underlying Insurance."  <u>See</u> Second Excess Policy attached hereto as Exhibit K.

42.    Evanston Insurance Company issued renewal Commercial Excess Liability Policy MKLV2EUL100047 to PWC which was in effect between June 14, 2016 and July 2, 2017 with limits of $1,000,000 each occurrence/$1,000,000 aggregate ("Third Excess Policy").  The Third Excess Policy identifies the Fourth Primary Policy as "Underlying Insurance."  <u>See</u> Third Excess Policy attached hereto as Exhibit L.

43.    Each Evanston Excess Policy is a limited follow form policy.  <u>See</u> Exhibits J, K and L.

<u>**REQUEST FOR DECLARATORY JUDGMENT**</u>

44.    EVANSTON requests a final declaratory judgment finding that there is no duty to defend or indemnify PWC in connection with the Rabils' allegations in the Underlying Complaint.

45.    Based upon the allegations in the Underlying Complaint, there are provisions,

11

terms, conditions and/or exclusions in the Policy which do not provide or otherwise operate to exclude coverage for PWC.

46.     There exists a bona fide, actual present and practical need for a declaration of coverage under the Policy and the rights and obligations of EVANSTON.

47.     The rights and obligations of EVANSTON under the Policy are dependent upon the facts and law applicable to the facts affecting coverage under the Policy.

48.     This demand for declaratory judgment is not made for the purposes of seeking a legal opinion, but rather is needed to resolve an existing dispute which creates doubt between the parties as to their legal rights, responsibilities, and obligations under the Policy.

49.     All proper and present antagonistic or adverse interests are before the Court by proper process.

**COUNT I**
**THE FIRST AND SECOND PRIMARY POLICIES ARE EXHAUSTED AND EVANSTON HAS NO FURTHER DUTY TO DEFEND OR INDEMNIFY PWC UNDER THE FIRST AND SECOND PRIMARY POLICIES**

50.     Paragraphs 1 through 49 are incorporated and re-alleged as if fully set forth herein.

51.     The First and Second Primary Policies include the Construction Risk Coverage Amendment which provides, in relevant part:

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY**.

CONSTRUCTION RISK COVERAGE AMENDMENT
(RESIDENTIAL UNIT LIMITATION)

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART

* * *

**C.**     The following is added to **SECTION IV – COMMERCIAL GENERAL LIABILITY CONDITIONS**:

If subcontractors are used, you must require, secure, and maintain certificates of insurance that confirm the subcontractors:

**a.**     Carry minimum Commercial General Liability coverage limits that are at least equal to the limits of this insurance; and

**b.**     Name you as an additional insured on their coverage.

Failure to comply with this condition does not void your coverage. If you do not comply, your limits of liability under this insurance will be reduced to sublimits of $50,000 Each Occurrence/$50,000 Aggregate, including loss adjustment expenses and defense. This sublimit is the most we will pay for all damages arising out of any one "occurrence", and the most we will pay for all claims under this insurance, including loss adjustment expenses, investigation and defense. If the sublimit is tendered or exhausted, we will not defend or continue to defend you in any "suit".

All other terms and conditions remain unchanged.

<u>See</u> Exhibit F and Exhibit G.

52.     PWC failed to require, secure and maintain certificates of insurance confirming that the subcontractors named PWC as an additional insured on their commercial general liability policies and that those policies limits were at least $1 million each occurrence/$2 million general aggregate/$2 million products-completed operations aggregate.

53.     PWC failed to comply with the conditions in the endorsement therefore reducing the limits of the First and Second Primary Policies to $50,000 each occurrence/$50,000 aggregate including loss adjustment expenses, investigation and defense.

54.     EVANSTON has incurred and paid in excess of $100,000 in loss adjustment expenses, investigation and defense and therefore the $50,000 sublimit under each of the First and Second Primary Policies has been exhausted.

55.     Because the $50,000 each occurrence/$50,000 aggregate sublimit under the First Policy and Second Primary Policy have each been exhausted by payment of in loss adjustment expenses, investigation and defense, EVANSTON has no further duty to defend or potentially indemnify PWC under the First Primary Policy and no further duty to defend or potentially indemnify PWC under the Second Primary Policy.

56.     WHEREFORE, EVANSTON seeks a judgment in its favor, declaring and adjudicating that EVANSTON is not obligated to further defend and/or indemnify PWC in the Underlying Lawsuit under either the First Policy or the Second Policy because the limits of the First Primary Policy and Second Primary Policy are exhausted.

**COUNT II**
**THE THIRD AND FOURTH PRIMARY POLICIES ARE OR WILL BE EXHAUSTED**
**AND EVANSTON HAS NO FURTHER DUTY TO DEFEND OR INDEMNIFY PWC**
**UNDER THE THIRD AND FOURTH PRIMARY POLICIES**

57.     Paragraphs 1 through 56 are incorporated and re-alleged as if fully set forth herein.

58.     The Third and Fourth Primary Policies include the Limitation – Contractor or Subcontractor Management endorsement which states:

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

**LIMITATION - CONTRACTOR OR SUBCONTRACTOR**
**MANAGEMENT**

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE FORM

| SCHEDULE | | |
|---|---|---|
| Minimum General Aggregate Limit (Other Than Products/Completed Operations): | $ | 2,000,000 |
| Minimum Products/Completed Operations Aggregate Limit: | $ | 1,000,000 |
| Minimum Each Occurrence: | $ | 1,000,000 |

**A.**     The following is added to Section **IV** — Commercial General Liability Conditions:

14

**Contractor Or Subcontractor Management**

Prior to the commencement of any work performed for or on behalf of the insured by a contractor or subcontractor; the insured must require, secure and maintain a certificate of insurance that confirms that the contractor or subcontractor:

    **a.**    Carries Commercial General Liability coverage with limits that are equal to or greater than the limits shown in the Schedule above; and

    **b.**    Names you as an additional insured on such coverage.

If no limits are shown in the Schedule above, then the limits carried by the contractor or subcontractor must be equal to or greater than the limits shown in the Declarations of this Coverage Form.

**B.**    If all of the conditions of the Contractor Or Subcontractor Management condition are not met or the insured fails to provide proof of compliance with such conditions at the time of an "occurrence", the following is added to Section **III** — Limits of Insurance and will apply to such "occurrence":

Subject to Paragraph 2. of Section **III** — Limits of Insurance, $50,000 is the most we will pay for the sum of all:

    **a.**    Damages under Coverage **A**;
    **b.**    Damages under Coverage **B**;
    **c.**    Medical Expenses under Coverage **C**;
    **d.**    Loss adjustment expenses;
    **e.**    Supplementary payments; and
    **f.**    Defense costs,

because of all "bodily injury", 'property damage", and "personal and advertising injury" arising out of any one "occurrence" when the insured fails to meet or provide proof of compliance with the Contractor Or Subcontractor Management condition.

Once this limit is exhausted, we are no longer obligated to defend or indemnify the insured for such "occurrence".

All other terms and conditions remain unchanged.

<u>See</u> Exhibit H and Exhibit I.

    59.    PWC failed to require, secure and maintain certificates of insurance confirming

that the subcontractors named PWC as an additional insured on their commercial general liability policies and that the subcontractors' policy limits were no less than the limits reflected in the Schedule of the Limitation – Contractor or Subcontractor Management endorsement.

60.     PWC failed to provide proof of compliance with the conditions as requested in Evanston's January 17, 2017 reservation of rights letter.

61.     PWC failed to comply with the conditions in the endorsement therefore reducing the limits of the Third Primary Policy and Fourth Primary Policy to $50,000 including damages, loss adjustment expenses, medical expenses, supplemental payments and defense costs because of "property damage" arising out of any one "occurrence".

62.     Because PWC failed to comply with the Limitation – Contractor or Subcontractor Management endorsement, the maximum possible amount available to defend and indemnify PWC under the Third Primary Policy and Fourth Primary Policy is $400,000 per policy.

63.     EVANSTON has incurred and/or paid $91,453.01 in loss adjustment expenses and/or supplementary payments and/or defense costs under the Third Primary Policy leaving $308,546.99[1] as the maximum amount remaining to defend and potentially indemnify PWC in the Underlying Lawsuit which has been or will be exhausted by payment of damages, loss adjustment expenses, medical expenses, supplemental payments and/or defense costs, prior to the conclusion of this action and prior to the conclusion of the Underlying Lawsuit.

64.     WHEREFORE, EVANSTON seeks a judgment in its favor, declaring and adjudicating that EVANSTON is not obligated to further defend and/or indemnify PWC in the

---

[1] Because the Pre-Existing Injury, Loss or Damage Exclusion in the Fourth Primary Policy applies to the allegations of the Underlying Complaint and/or the actual indisputable facts to preclude coverage under the Fourth Primary Policy, as discussed in Count III, the maximum available amounts remaining to defend and potentially indemnify PWC are the reduced remaining limits under the Third Primary Policy only.

Underlying Lawsuit upon exhaustion of the reduced limits of the Third and Fourth Primary Policies pursuant to the Limitation – Contractor and Subcontractor Management endorsement.

**COUNT III**
**EVANSTON HAS NO DUTY TO DEFEND OR INDEMNIFY PWC UNDER THE FOURTH PRIMARY POLICY AND THE THIRD EXCESS POLICY BECAUSE THE PRE-EXISTING INJURY, LOSS OR DAMAGE EXCLUSION EXCLUDES COVERAGE**

65.     Paragraphs 1 through 56 are incorporated and re-alleged as if fully set forth herein.

66.     The Pre-Existing Injury Loss or Damage Exclusion in each Primary Policy provides:

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

**PRE-EXISTING INJURY, LOSS OR DAMAGE EXCLUSION**

The coverage under this policy does not apply to "bodily injury," "property damage," or "personal and advertising injury" or any injury, loss or damage:

(A)     which first occurred, began to occur, or is alleged to have occurred prior to, or is alleged to be in the process of occurring to any degree, as of the inception date of this policy;

(B)     which is caused by or alleged to have been caused by incremental, continuous or progressive damage arising from an "occurrence" which first occurred, began to occur, or is alleged to have occurred prior to the inception date of this policy.

All other terms and conditions remain unchanged.

See Exhibits F, G, H and I.

67.     The Pre-Existing Injury, Loss or Damage Exclusion excludes coverage for "property damage" which first occurred, began to occur or occurred to any degree prior to the inception date of each Primary Policy.

68.     The Pre-Existing Injury, Loss or Damage Exclusion excludes coverage for "property damage" or any injury loss or damage which is caused by or alleged to have been

17

caused by incremental, continuous or progressive damage arising from an "occurrence" which first occurred, began to occur, or is alleged to have occurred prior to the inception date of each Primary Policy.

69.    PWC's allegedly defective work – including the allegedly defective work of PWC's subcontractors – first occurred, began to occur and/or is alleged to have occurred and was completed prior to  June 14, 2016, the inception of the Fourth Primary Policy.

70.    Any "property damage" and injury, loss or damage allegedly suffered by the Plaintiffs is caused by or alleged to have been caused by incremental, continuous or progressive damage arising out of an occurrence which precedes the inception of the Fourth Primary Policy and therefore, the coverage under the Fourth Primary Policy does not apply to the Underlying Lawsuit.

71.    The Third Excess Policy follows the terms, conditions, definitions and exclusions of the Fourth Policy unless the terms, conditions, definitions and exclusions of the Fourth Policy are contrary to the terms, conditions, definitions and exclusions of the Third Excess Policy.  See Exhibit L.

72.    Because the Pre-Existing Injury Loss or Damage Exclusion is incorporated into the Third Excess Policy and/or the Third Excess Policy's Exclusion Prior Incidents and Prior Construction Defects endorsement excludes coverage for the Underlying Lawsuit, the Third Excess Policy does not apply to the Underlying Lawsuit.  See Exhibit L.

73.    WHEREFORE, EVANSTON seeks a judgment in its favor, declaring and adjudicating that EVANSTON is not obligated to defend or indemnify PWC in the Underlying Lawsuit under the Fourth Primary Policy or the Third Excess Policy.

18

**COUNT IV**
**EVANSTON DOES NOT HAVE A DUTY TO DEFEND OR INDEMNIFY PWC**
**BECAUSE THE UNDERLYING COMPLAINT DOES NOT ALLEGE "PROPERTY**
**DAMAGE" CAUSED BY AN "OCCURRENCE" UNDER THE PRIMARY POLICIES**

74.     Paragraphs 1 through 56 are incorporated and re-alleged as if fully set forth herein.

75.     The insuring agreements in the Primary Policies provide, in part, for payment for "property damage" caused by an "occurrence."  See Exhibits F, G, H and I.

76.     The Primary Policies define "occurrence" as "an accident, including continuous or repeated exposure to substantially the same general harmful conditions."

77.     The Underlying Complaint sets forth claims for construction defects and faulty workmanship.  See Exhibit A.

78.     The Primary Policies do not provide coverage for the damages sought in the Underlying Lawsuit because the damages alleged did not result from an "occurrence."

79.     The Underlying Complaint does not specifically allege damage to property other than the property that was the subject of the construction project itself.

80.     The Underlying Complaint alleges noncompliant and defective workmanship. See Exhibit A, ¶28 and subparts.

81.     The Primary Policies do not provide coverage for the damages sought in the Underlying Lawsuit because the alleged damage does not constitute "property damage" as defined in the Primary Policies.

82.     Because the Excess Policies follow the form of the Primary Policies, the Excess Policies also do not provide coverage to PWC because the damages alleged did not result from an "occurrence" and/or do not constitute "property damage" under the Primary Policies.

83.     WHEREFORE, EVANSTON seeks a judgment in its favor, declaring and adjudicating that EVANSTON is not obligated to defend and/or indemnify PWC for damages sought in the Underlying Lawsuit because the alleged damages do not fall within the insuring agreement of the Primary Policies because there was no "occurrence" and/or no "property damage" under the Primary Policies and, concomitantly, no coverage under the Excess Policies.

**COUNT V**
**EACH PRIMARY POLICY EXCLUDES COVERAGE FOR "PROPERTY DAMAGE"**
**ARISING OUT OF PWC'S WORK AND/OR THE WORK OF PWC'S**
**SUBCONTRACTORS**

84.     Paragraphs 1 through 56 are incorporated and re-alleged as if fully set forth herein.

85.     Each Primary Policy includes the following language:

**2.      Exclusions**
This insurance does not apply to:

***

**j.      Damage to Property**

"Property damage" to
***

  **(5)**     That particular part of real property on which you or any contractors or subcontractors working directly or indirectly on your behalf are performing operations, if the "property damage" arises out of those operations; or

  **(6)**     That particular part of any property that must be restored, repaired or replaced because "your work" was incorrectly performed on it.

***

~~Paragraph (6) of this exclusion does not apply to "property damage" included in the "products-completed operations hazard".~~
[This last paragraph deleted by endorsement in the First and Second Policies.]

***

**l.      Damage to Your Work**
"Property damage" to "your work" arising out of it or any part of it and

20

included in the "products-completed operations hazard".
~~This exclusion does not apply if the damaged work or the work out of which the damage arises was performed on your behalf by a subcontractor.~~
[The last paragraph deleted by endorsement in all Policies.]

<u>See</u> Exhibits F, G, H and I.

86.     The Primary Policies only provide coverage for "property damage" which happens during the policy period, and is caused by an "occurrence."

87.     Claims seeking repair and replacement of defective or non-compliant work do not constitute "property damage".

88.     PWC's work began no earlier than December 18, 2013, the date of the Rabils' construction contract with Seaside, and was completed no later than March 30, 2016, the date the Certificate of Occupancy was issued.

89.     Any "property damage" occurring to that particular part of real property on which PWC or PWC's subcontractors were performing operations, while PWC or its subcontractors were performing operations, is excluded pursuant to Exclusion 2.j.5 in the Primary Policies if the property damage arose out of those operations.

90.     Any "property damage" occurring to "[t]hat particular part of any property that must be restored, repaired or replaced because [PWC's work or the work of PWC's subcontractors] was incorrectly performed on it," is excluded pursuant to Exclusion 2.j.6 in the Third Primary Policy and Fourth Primary Policy if the "property damage" occurred prior to the time PWC's work was included within the "products-completed operations hazard".   <u>See</u> Exhibits H and I.

91.     Any "property damage" occurring to "[t]hat particular part of any property that must be restored, repaired or replaced because [PWC's work or the work of PWC's subcontractors] was incorrectly performed on it," is excluded pursuant to Exclusion 2.j.6, as

amended by the Construction Risk Coverage Amendment, in the First Primary Policy and Second Primary Policy if the "property damage" occurred while PWC was working or after PWC's work was completed.  See Exhibits F and G.

92.    Any "property damage" arising out of PWC's or its subcontractors' completed work is excluded under each of the Evanston Policies pursuant to Exclusion 2.l., as amended by the Construction Risk Coverage Amendment in the First Primary Policy and Second Primary Policy and the Exclusion – Damage to Work Performed by Subcontractors on Your Behalf endorsement in the Third Primary Policy and Fourth Primary Policy.  See Exhibits F, G, H and I.

93.    Because the Excess Policies follow the form of the Primary Policies, Exclusions 2.j.5 and 2.j.6., as described in paragraphs 84-86, *supra,* also apply to exclude coverage under the Excess Policies.

94.    Because the Excess Policies follow the form of the Primary Policies, the Excess Policies also do not provide coverage for damage to or arising out of PWC's completed work or the completed work of PWC's subcontractors.

95.    WHEREFORE, EVANSTON seeks a judgment in its favor, declaring and adjudicating that EVANSTON is not obligated to indemnify PWC for damages arising out of PWC's work or the work of PWC's subcontractors in the Underlying Lawsuit as all such damages are excluded under each of the Primary Policies and, concomitantly, each of the Excess Policies.

## COUNT VI
## EVANSTON HAS NO DUTY TO INDEMNIFY PWC UNDER THE PRIMARY POLICIES FOR ANY "PROPERTY DAMAGE" CAUSED BY, CONTRIBUTED TO BY OR ARISING OUT OF FUNGI

96.    Paragraphs 1 through 56 are incorporated and re-alleged as if fully set forth herein.

97.     Each Primary Policy contains the following endorsement:

**COMBINATION GENERAL ENDORSEMENT**[2]

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART

\*\*\*

**B.**     The following **Exclusions** are added:

This insurance does not apply to:

\*\*\*

**4.**     "Bodily injury", "property damage", "personal and advertising injury" or any injury, loss, or damages, including consequential injury, loss or damage, arising out of, caused by or contributed to by:

\*\*\*

**d.**     Asbestos, lead, silica dust and/or toxic dust, "fungi", bacteria, organic pathogens, bio-organic growth and/or systematic chemical poisoning:

**(1)**     Whether arising out of actual, alleged or threatened inhalation of, ingestion of, contact with, exposure to, existence of, presence of, discharge, dispersal, seepage, migration, infiltration, infestation, release, escape, growth, production or reproduction of or toxic substances from asbestos, lead, silica dust, dust and/or toxic dust, "fungi", bacteria, organic pathogens, bio-organic growth and/or systematic chemical poisoning.  This applies regardless of source, including but not limited to, from any goods, products or structures containing same, existence of same in any form, in occupancy or construction, manufacture, sale, transportation, handling, storage, disposal or removal of same; and

**(2)**     Regardless of supervision, instructions, recommendation, requests, warnings or advice given or which should have been given, as well as any costs, including but not limited to abatement, mitigation, removal, containment, treatment, detoxification, neutralization, or disposal of same, or in any way response to assess the effects of same.

---

[2] This version of the Combination General Endorsement appears in the First and Second Primary Policies (MEGL 0001 06 12).  See Exhibits F and G.  The version of the Combination General Endorsement in the Third and Fourth Primary Policies (MEGL 0001 08 14) includes a differently formatted but similarly worded fungi exclusion.  See Exhibits H and I.

Coverage does not apply to any loss, cost or expenses arising out of the abating, testing for, monitoring, cleaning up, removing, containing, treating, detoxifying, neutralizing, remediating or disposing of, or in any way, responding to, or assessing the effects by any insured or by any other person or entity.

"Fungi" as used herein means any type or form of fungus, including mold or mildew and any mycotoxins, spores, scents or byproducts produced or released by "fungi". However, this exclusion does not apply to any "fungi" or bacteria that are on, or are contained in, a good or product intended for bodily consumption.

\*\*\*

All other terms and conditions remain unchanged.

98.    Plaintiffs allege water intrusion as a result of the allegedly defective construction of the Home.  See e.g., Exhibit C, Amended Third-Party Complaint at Exhibit B at 2.1.2; 9.1; 9.16; 13.7.

99.    To the extent Plaintiffs seek recovery for damage arising out of, caused by or contributed to by fungi including but not limited to mold, the Combination General Endorsement in each Primary Policy excludes coverage for any and all such injury, loss or damage including but not limited to monitoring, testing and clean-up costs.  See Exhibits F, G, H and I.

100.    Because the Excess Policies follow the form of the Primary Policies, the Excess Policies also do not provide coverage for damage arising out of, caused by or contributed to by fungi including but not limited to monitoring, testing and clean-up costs.

101.    WHEREFORE, EVANSTON seeks a judgment in its favor, declaring and adjudicating that EVANSTON is not obligated to indemnify PWC for damage arising out of, caused by or contributed to by fungi including but not limited to mold which is excluded under the Primary Policies and, concomitantly, excluded under the Excess Policies.

## COUNT VII
## EVANSTON HAS NO DUTY TO INDEMNIFY PWC UNDER THE THIRD AND FOURTH PRIMARY POLICIES AND THE SECOND AND THIRD EXCESS POLICIES BECAUSE PWC KNEW PRIOR TO THE POLICY PERIODS THAT "PROPERTY DAMAGE" HAD OCCURRED

102.    Paragraphs 1 through 56 are incorporated and re-alleged as if fully set forth herein.

103.    The insuring agreements in the Third and Fourth Primary Policies provide that if PWC knew that "property damage" had occurred in whole or in part prior to the policy period, "then any continuation, change or resumption of such 'property damage' during or after the policy period will be deemed to have been known prior to the policy period." See Exhibits H and I.

104.    Upon information and belief, PWC knew that "property damage" occurred in whole or in part prior to June 14, 2015, the inception of the Third Primary Policy.

105.    PWC knew "property damage" occurred in whole or in part prior to June 14, 2016, the inception of the Fourth Primary Policy.

106.    Upon information and belief, Seaside, including its member, PWC, knew that "property damage" occurred in whole or in part prior to June 14, 2015, the inception of the Third Primary Policy.

107.    Seaside, including its member, PWC, knew that "property damage" occurred in whole or in part prior to June 14, 2016, the inception of the Fourth Primary Policy.

108.    Because PWC knew that "property damage" had occurred in whole or in part prior to the inception of the Third Primary Policy and Fourth Primary Policy, any continuation, change or resumption of such 'property damage' during or after the time the Third Primary

Policy incepted and the Fourth Primary Policy incepted will be deemed to have been known prior to the inception of each of those policies.

109.    Because the "property damage" is deemed to have been known prior to the inception of the Third Primary Policy and Fourth Primary Policy, the Underlying Lawsuit does not fall within the insuring agreement of the Third and Fourth Primary Policies and therefore, the Third Primary Policy and Fourth Primary Policy do not provide coverage for the Lawsuit.

110.    The Second Excess Policy follows the terms, conditions, definitions and exclusions of the Third Primary Policy unless the terms, conditions, definitions and exclusions of the Third Primary Policy are contrary to the terms, conditions, definitions and exclusions of the Second Excess Policy[3].  See Exhibit K.

111.    The Third Excess Policy follows the terms, conditions, definitions and exclusions of the Fourth Policy unless the terms, conditions, definitions and exclusions of the Fourth Policy are contrary to the terms, conditions, definitions and exclusions of the Third Excess Policy[4].  See Exhibit L.

112.    Because the insuring agreement language in the Third and Fourth Primary Policies is incorporated into the Second and Third Excess Policies, respectively, and/or the Second and Third Excess Policies' Known Injury or Damage Limitation endorsement applies, the Second and Third Excess Policies does not apply to the Underlying Lawsuit.  See Exhibits K and L.

---

[3] The Second Excess Policy includes a Known Injury or Damage Limitation endorsement which is substantially similar to the language included in the insuring agreement of the Third Primary Policy.  If different, however, the language included in the Second Excess Policy controls.  See Exhibit K.

[4] The Third Excess Policy includes a Known Injury or Damage Limitation endorsement which is substantially similar to the language included in the insuring agreement of the Fourth Primary Policy.  If different, however, the language included in the Third Excess Policy controls.  See Exhibit L.

113.    WHEREFORE, EVANSTON seeks a judgment in its favor, declaring and adjudicating that EVANSTON is not obligated indemnify PWC for damages sought in the Underlying Lawsuit because the Underlying Lawsuit does not fall within the insuring agreements of the Third Primary Policy and Fourth Primary Policy and, concomitantly, the second and Third Excess Policies, and EVANSTON is not obligated to indemnify PWC under the Third and Fourth Primary Policies and Second and Third Excess Policies.

## COUNT VIII
## EVANSTON HAS NO DUTY TO DEFEND OR INDEMNIFY PWC UNDER THE FIRST EXCESS POLICY

114.    Paragraphs 1 through 56 are incorporated and re-alleged as if fully set forth herein.

115.    The First Excess Policy follows the Insuring Agreements, Definitions, Conditions and Exclusions of the Second Primary Policy.

116.    The Second Primary Policy is "excess over [a]ny other primary insurance available to [PWC] covering liability for damages arising out of the premises or operations, or the products and completed operations, for which [PWC] has been added as an additional insured by attachment of an endorsement."  See Exhibit G.

117.    The First Excess Policy provides that EANSTON "shall not be called upon to assume charge of the investigation, settlement or defense of any claim made, or suit brought, or proceedings instituted against the Insured, but shall have the right and be given the opportunity to be associated in the defense and trial of any such claim, suit or proceeding relative to any occurrence which, in the opinion of the Company, may create liability on the part of the Company under the terms of this policy."  See Exhibit J.

118.     The Independent Contractor Endorsement in the First Excess Policy provides that if the insured fails to meet the requirements of the endorsement which include securing "a written agreement from each and every Independent Contractor holding the insured harmless"; "obtain certificates of insurance from each and every Independent Contractor stating that the Independent Contractor maintains commercial general liability insurance coverage … "; and "certificates shall evidence [PWC] as an additional insured."  <u>See</u> Exhibit J.

119.     If  the insured fails to comply with the Independent Contractor Endorsement, the First Evanston Excess Policy "will respond as if such underlying insurance coverage were in place."  <u>See</u> Exhibit J.

120.     The First Excess Policy does not include a duty to defend.

121.     The First Excess Policy indemnifies the Insured for "that portion of Ultimate Net Loss in excess of the limits of Underlying Insurance."  <u>See</u> Exhibit J.

122.     PWC failed to comply with the Construction Risk Coverage Amendment in the Second Primary Policy.

123.     PWC failed to comply with the Independent Contractor Endorsement in the First Excess Policy.

124.     EVANSTON has no obligation to indemnify PWC under the First Excess Policy until a minimum of $2 million in underlying insurance has been exhausted by paying for covered damages.

125.     WHEREFORE EVANSTON seeks a judgment in its favor, declaring and adjudicating that EVANSTON is not obligated to defend and/or indemnify PWC in the Underlying Lawsuit under the First Excess Policy.

28

## COUNT IX
## EVANSTON HAS NO DUTY TO DEFEND OR INDEMNIFY PWC UNDER
## THE SECOND AND THIRD EXCESS POLICIES

126.    Paragraphs 1 through 56 are incorporated and re-alleged as if fully set forth herein.

127.    The Second and Third Excess Policies are "subject to the same terms, conditions, agreements, exclusions and definitions as the [Third and Fourth Primary Policies, respectively] except … with respect to any provisions to the contrary" in the Second and Third Excess Policies.  See Exhibits K and L.

128.    The Third and Fourth Primary Policies are "excess over [a]ny other primary insurance available to [PWC] for liability for damages damages arising out of the premises or operations, or the products and completed operations, for which [PWC] has been added as an additional insured."  See Exhibits H and I.

129.    The Second and Third Excess Policies provide that Evanston "will have … a duty to defend … claims or suits [seeking damages because of injury to which this insurance may apply] when the applicable limit of insurance of the 'Underlying Insurance' has been exhausted by payment of judgments, settlements and any cost or expense subject to such limit. … ."  See Exhibits K and L.

130.    The Contractors and Subcontractors – Indemnification and Insurance Conditions endorsement in the Second Excess Policy and Third Excess Policy provides that if the insured fails to comply with any of the conditions which include, but are not limited to, being named as an additional insured on the subcontractors' CGL occurrence-based policies; the required subcontractor insurance is primary and non-contributory; and is evidenced by certificates of insurance. See Exhibits K and L.

131.    If the insured fails to comply with the Contractors and Subcontractors – Indemnification and Insurance Conditions, the Second and Third Excess Policies "will apply to the same extent had the contractor or subcontractor maintained the insurance as required by this endorsement." See Exhibit K and L.

132.    PWC failed to comply with the Limitation - Contractor Or Subcontractor Management endorsements in the Third and Fourth Primary Policies.

133.    PWC failed to comply with the Contractors and Subcontractors – Indemnification and Insurance Conditions in the Second Excess Policies and Third Excess Policy.

134.    The Second and Third Excess Policy shall apply as if the "underlying insurance" were valid and collectible.  See Exhibits K and L.

135.    EVANSTON has no obligation to defend or indemnify PWC under the Second and Third Excess Policies until a minimum of $2 million in underlying insurance has been exhausted for each occurrence by paying for judgments, settlements and any cost or expense.

136.    WHEREFORE EVANSTON seeks a judgment in its favor, declaring and adjudicating that EVANSTON is not obligated to defend and/or indemnify PWC in the Underlying Lawsuit under the Second and Third Excess Policies.

### **Relief Sought**

For the reasons set forth above, EVANSTON seeks the following declarations:

a.      That this Court has jurisdiction over the parties in this matter.

b.      That EVANSTON has no duty to indemnify PWC because the Underlying Complaint alleges damages that do not constitute "property damage" and/or were not caused by an "occurrence" under the Primary Policies.

c.      That EVANSTON has no duty to defend or indemnify PWC under the Fourth

Primary Policy and the Third Excess Policy because the Pre-existing Injury, Loss or Damage Exclusion excludes coverage under the Fourth Primary Policy and the Third Excess Policy.

d.   That PWC's failure to comply with the Construction Risk Coverage Amendment in the First and Second Primary Policies have reduced the limits available under those polices to $50,000 each occurrence/$50,000 aggregate, including loss adjustment expenses and defense, and the First and Second Primary Policies have therefore been exhausted and EVANSTON has no further duty to defend or potentially indemnify PWC under the First Primary Policy and the Second Primary Policy.

e.   That PWC's failure to comply with the Limitation – Contractor or Subcontractor Management endorsement in the Third and Fourth Primary Policies have reduced the limits available under those polices to $50,000 including damages, loss adjustment expenses, medical expenses, supplemental payments and defense costs because of "property damage" arising out of any one "occurrence".  Therefore, the maximum amount available to defend and potentially indemnify PWC under the Third and Fourth Primary Policy is the remaining limit under the Third Primary Policy which has, or will be, exhausted and EVANSTON will have no further obligation to defend or potentially indemnify PWC under the Third Primary Policy and/or Fourth Primary Policy.

f.   That EVANSTON has no duty to indemnify PWC for damages arising out of, caused by or contributed to by fungi including but not limited to mold.

g.   That EVANSTON has no duty to indemnify PWC under the Third and Fourth

Primary Policies and Second and Third Excess Policies because the injury and/or damage was known to PWC prior to the inception of those policies.

h.    That EVANSTON has no obligation to PWC under the Excess Policies.

i.     That EVANSTON has no further duty to defend PWC with respect to the allegations and claims asserted in the Underlying Lawsuit.

j.     That EVANSTON is entitled to reimbursement of any expenses incurred in excess of the reduced limits of the Primary Policies.

k.     That the Primary Policies are exhausted and EVANSTON has no duty to indemnify PWC for any of the damages sought or claimed in the Underlying Lawsuit.

l.     That EVANSTON be awarded its lawful costs in connection with the prosecution of this action.

m.    Such other relief that this Court deems just and proper.

WHEREFORE, EVANSTON INSURANCE COMPANY seeks entry of judgment in its favor, declaring and adjudicating that EVANSTON has no duty to defend and no duty to indemnify PWC from any claims alleged in the Underlying Lawsuit.  Further, EVANSTON demands judgment for its costs and such further relief as the Court may deem just and proper.

Dated:  April 4, 2018

Respectfully submitted,

/s/ Rebecca C. Appelbaum
REBECCA C. APPELBAUM, ESQ.
LEAD ATTORNEY
Florida Bar No.: 0179043
rebecca.appelbaum@arlaw.com
teresa.soluri@arlaw.com

DEBORAH H. OLIVER, ESQ.
Florida Bar No. 485111
deborah.oliver@arlaw.com
jenny.schroeder@arlaw.com

CHELSEA C. HARRISON, ESQ.
Florida Bar No.: 98536
chelsea.harrison@arlaw.com
lisa.stallard@arlaw.com

ADAMS AND REESE LLP
101 E. Kennedy Blvd., Suite 4000
Tampa, Florida  33602
(813) 402-2880 (Telephone)
(813) 402-2887 (Facsimile)
*Attorneys for Plaintiff, Evanston Insurance Company*

## CERTIFICATE OF SERVICE

I hereby certify that on April 4, 2018, a true and correct copy of the foregoing Amended Complaint for Declaratory Judgment has been furnished via CM/ECF to all counsel of record on the service list, as well as to Kelly Corcoran via email to kcorcoran@balljanik.com, counsel for Defendants Patrick Whyte Construction, Inc. and Seaside Builders, LLC who has completed a waiver of service on their behalf but not yet entered a formal appearance.

/s/ Rebecca C. Appelbaum
REBECCA C. APPELBAUM, ESQ.

33